ESTATE OF GERTRUDE BATH, DECEASED, T. A. BATH, INDEPENDENT EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Estate of Bath v. Comm'r
Docket No. 7277-70. United States Tax Court
T.C. Memo 1975-102; 1975 Tax Ct. Memo LEXIS 269; 34 T.C.M. (CCH) 493; T.C.M. (RIA) 750102; April 15, 1975, Filed. Robert Edwin Davis, for the petitioner. Kenneth A. Little, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in estate tax of the Estate of Gertrude Bath, Deceased, T. A. Bath, Independent Executor, in the amount of $23,763.52. The issue for decision is whether the Estate is entitled to deduct as a claim against the estate, under section 2053, I.R.C. 1954, [1] the sum of $85,953.32 paid to Paul Loyd Bath. FINDINGS OF FACT *270 Some of the facts have been stipulated and are found accordingly. T. A. Bath (Tisbey) as Independent Executor of the Estate of Gertrude Bath, filed the estate tax return for the estate with the district director of internal revenue, Dallas, Texas on October 19, 1967. At the time the petition in this case was filed, the Independent Executor was a resident of Henderson, Texas. Gertrude Bath (decedent), a widow who was a resident of Henderson, Texas, died on July 23, 1966. Decedent was married to Marx Bath, who had died on December 20, 1932. Three children were born of the marriage of decedent and Marx Bath, a daughter, Blossom Bath Grossblatt (Blossom), and two sons, Tisbey A. Bath (Tisbey) and Paul Loyd Bath (Paul). Decedent never remarried after her husband's death in 1932. At the time of Marx Bath's death, he and decedent owned an estate which included corporate stocks, a mercantile business, 2,000 acres of farmlands, 30 or 40 rental properties, notes and accounts receivable, and other real and personal property. The value of the estate was at least $114,000 in 1932. Decedent's husband left his interest in the property they owned at the date of his death to decedent. Beginning *271 in early 1933 Paul began to manage decedent's property for her. Paul was born in 1908 and was 24 years old at the time he began managing decedent's property. Paul operated the mercantile store until 1936 when the operation of this store was discontinued, managed the real estate, negotiated and closed the sale of farms and rental properties, leased land for oil and gas, and leased the rental properties on behalf of decedent. He arranged for repairs to buildings and kept books of account with respect to decedent's properties. Decedent required that any action taken by Paul be approved by her. Although Paul negotiated leases, decedent required that she sign the lease and required that Paul make no purchase or sale of securities without her consent. Paul is an attorney licensed to practice in the State of Texas. He received his license about 1937. Thereafter, Paul performed certain legal services such as drafting leases and deeds, and examining deeds in connection with the management of decedent's estate. Paul, however, obtained the counsel of Tisbey who was also a lawyer licensed to practice in the State of Texas and retained other lawyers concerning legal matters regarding decedent's *272 business affairs. Paul also participated in handling litigation involving leases in the Panola County gas field on behalf of decedent, which litigation resulted in increasing decedent's income for a period of time by about $600 per month. Decedent, after the death of her husband, often traveled in Europe and elsewhere and often visited her daughter, Blossom, in California for an extended period. Paul continued to manage decedent's properties from early 1933 until the latter part of 1956 except for the period of 4 or 5 years while he was in the military service during World War II. While Paul was in the service decedent handled her own affairs with the assistance of a lawyer and a secretary. During the time Paul was managing decedent's properties, the yearly income from the properties varied from approximately $13,000 to approximately $29,000 exclusive of capital transactions. Payments of bonuses upon the execution of oil and gas leases were at times as much as $37,500 in an individual transaction. Paul negotiated lease arrangements for decedent which were more favorable generally than those secured by others in the area. From time to time Paul and decedent would have dis-agreements *273 and an effort would be made to find someone other than Paul to perform management services for decedent. Such a dispute arose between Paul and decedent shortly after decedent's husband's death and Tisbey attempted unsuccessfully to find someone else to manage decedent's properties. At the time the maximum decedent was willing to pay to anyone to manage the properties was $200 a month with possibly the furnishing of living quarters and an automobile for the use of the manager. Tisbey was unsuccessful in finding someone to take over the management of decedent's properties in 1933. Later, in 1945, decedent again attempted unsuccessfully to procure someone to perform management services for her properties. After Paul began managing decedent's properties, the management responsibility increased, particularly after the end of World War II. In the period following World War II decedent became dissatisfied with Paul as her property manager. Decedent considered that Paul adopted a proprietary attitude toward her property and Paul and decedent had many quarrels concerning the management of the property. In 1956 Paul had a heart attack. During World War II Paul had suffered from combat fatigue *274 and had been hospitalized both in England and in Brigham, Utah. During his hospitalization in Brigham, Utah, Paul was in a locked ward. Following his hospitalization in Brigham, Utah Paul was retired as an Army Captain because of disability and thereafter throughout the period here involved he drew retired Army pay as a captain. In November of 1956 decedent and Blossom went to Paul's office in Marshall, Texas, picked up decedent's records in Marshall, Texas, and delivered these records to Tisbey. Tisbey understood that he would keep the books and records with respect to decedent's properties from then on, but that Paul would continue to supervise the properties and collect rents. However, at that time Paul's general power of attorney to act for decedent was revoked. After Tisbey began keeping decedent's books, his firm was paid $100 per month. Tisbey had been a practicing attorney in Texas since 1929 and he is experienced in handling decedents' estates. During the early years of Paul's management of decedent's properties he was furnished room and board by decedent and paid $100 per month. When Paul left to go into the military service in 1940, he was being paid $125 per month, *275 and he and his family were furnished a home and the use of an automobile by decedent. After Paul returned from World War II, he was paid $250 a month for a period of time, and starting in about 1950, he was paid $400 per month. During all of this time Paul was furnished the use of an automobile. He was also furnished a home for himself and his family prior to the time in approximately 1947 when decedent transferred her homestead and another piece of realty to Paul. This transfer to Paul was in addition to other gifts made to him by decedent which were equal to gifts made simultaneously to her other two children. During the time Paul managed decedent's affairs he considered that he was being compensated in a satisfactory manner for the work he did. Paul maintained an office for the practice of law and did some legal practice in addition to managing decedent's affairs. Paul totally ceased to participate in the management of decedent's affairs in early 1957. On December 22, 1956, Paul wrote decedent a letter stating in part: You know it is up to you now to check to see that your business is attended to, that is such as the taxes I wrote you about and also the following * * * [Four *276 specific items were then listed.] * * * * * I know you think I am a stinker for not working with the rest of the family, but they did not help me when I asked them to and I think they are entitled to the same treatment I got. I had very little trouble attending to this by myself, so I see no reason why you with all of the additional help that you have should have any trouble. The people that were helping me were mediocre and you have pure Geniuses helping you. * * * * * I have a full time job now collecting the rent and looking after the farm. A postscript to this letter read as follows: Some one told me a short time ago that I had been drawing a tremendous salary for doing nothing. On January 16, 1966, Paul wrote a letter to decedent which stated in part as follows: You, it seems to me, are trying to connect me in some way with that incident in Henderson last October between Blossom and Tisbey. All I know about that is what Blossom told me which I am sure in my mind is true, as I have always found Blossom to be honest and truthful, I also know that she does not exaggerate. I further know that when Blossom promises any one anything that she will honor her commitments. *277 Blossom has never told me that she was going to do anything that she has not done. I also know that Blossom is not two faced or underhanded, and that she has a good mind and is capable of sound thinking. Blossom has been very ill and does need some kindness and consideration, which she did not get in Henderson. Furthermore I know that Blossom has done many fine things for you and has entertained you lavishly. I also know that she has paid you in cash for things that you have done for her. I am sure that Blossom is not satisfied with Tisbey's conduct of matters in connection with that trust, and also that she does not want to have any dealings with him whatever, and that goes for me double. Your trying to make all of the decisions for your family, and your trying to push them together, has destroyed the friendly relationship that a family should have. I helped you with your business for over 30 years, for small pay, but with yourpromise that I was working for myself, and that you would treat us all alike. This,youhavenotdone. You have against my wishes put Tisbey in a position where he is attempting to tell me how to live, and how to raise my family. *278 Since that trust was set up this country has had five of the best years of business in its history, and the income from that trust has been less than 1%. The manner in which this has been handled has not only created bad feelings in the family but it is interfering with me in assisting my children in their education. An education in the world today is of the utmost importance. You seem to resent the fact that I have asked people to talk to you about this trust set up, but you have refused to discuss it with me. You can expect protests about this until it is adjusted. The final chapter in this matter will be decided later. You can take some action now that will cause a favorable outcome, or you can let it continue to cause unhappiness in your family. The choice is yours and you will be responsible for the final outcome. In July of 1959 Paul went to work for a brokerage firm. After his services on behalf of decedent were terminated Paul continued to irritate and aggravate decedent. Decedent in late 1956 wrote a series of letters to Tisbey about Paul. In a letter dated November 28, 1956, to Tisbey, decedent stated: I don't have to tell you Paul won't cooperate You know it *279 as well as I * * * questioning him only brings out more arguments and I cannot combat him -- you know he will declare himself right * * * if he was normal he would see how dreadfully annoying it is -- but he really thinks -- by his attitude towards you he will get me desperate and you disgusted so we'll both quit. * * * It's no use eating my heart out about him and the way he acts and is acting -- he has always been that way * * * In a letter dated December 4, 1956, decedent wrote Tisbey: In his [Paul's] mental condition -- I can't see where I can take any other stand -- Tisbey -- he doesn't hate you as he does me -- it's not really hate either because he does have a brotherly feeling -- socially -- for you -- but his real resentment is against me and it dates way back -- but he can't show it against me -- at least not afford it -- so he let's it out -- on you. It's his mental quirk -- rule or ruin -- he really acts like a rat caught in a trap -- it's a horrid similie but it's because for the last 20 years his mind has run along one line and now it's all mixed up -- * * * In a letter mailed December 20, 1956, decedent stated in part to Tisbey: I am as exaperated [sic ] *280 as all Hell -- at Paul -- I am not going to answer his letters to me as I don't appreciate his attitude at all -- he's making it hard for me and you and I don't care if we lose money or whatever else -- I just want them to leave me alone -- I will not have him worry me -- * * * Under date of July 22, 1958, decedent wrote Tisbey a letter which stated in part: I sent Paul the papers on the royalty. When he rang me sometime ago he mentioned that he wanted the original gift of the royalty -- rewritten -- which would mean more controversy and the only way it would satisfy him -- would be if he got what he wanted. Now he knows if he signs the papers you sent or I sent he would be acknowledging the original papers and if he doesn't and displeases me -- I may disinherit him -- so he is really up against it -- then he wants me to buy the house -- So there is a possibility. Now remember Tisbey -- Paul has an inferiority complex and it's only money -- possessions -- that will give him the self assurance he feels he needs -- and he is burned up at the three of us who stand in his way -- it's not normal that he is -- so lets forget about him being that way -- he is to be pitied. You *281 know I never did think he was normal. We can thank goodness we are more normal than he is. Decedent had discussed with Tisbey the possibility of disinheriting Paul. The inter vivos trust which decedent had set up for Paul and which was referred to in Paul's letter to decedent dated January 16, 1966, was a constant cause of friction between Paul and Tisbey. Tisbey was the trustee of this trust and Paul considered that he was unfairly treated by Tisbey and had consulted a number of lawyers in East Texas with respect to having Tisbey removed as trustee. At times decedent showed fear of Paul. When decedent was in the hospital during her last illness, she left instructions with the nurses not to permit Paul into her room. Four days after decedent's death, Tisbey offered for probate in the County Court of Rusk County, Texas, a will of decedent's dated January 18, 1960, and codicil dated December 29, 1960. Decedent's will of January 18, 1960, and codicil of December 29, 1960, made small specific bequests, and left the residue of her estate one-third outright to Tisbey, one-third to Tisbey in trust for the benefit of Blossom with the remainder to Blossom's children upon Blossom's *282 death, and one-third to Tisbey in trust for Paul with the remainder in equal shares to Paul's three children. The trust provided that the trustee should have power to pay out of income and corpus of the trust at such times and in such amount as the trustee may deem proper all of the expense for the comfort and support of the beneficiaries in keeping with their usual way of living, their means and station in life, and their individual requirements, and that the trustee should have the power to make cash distributions out of the income and corpus at such times and in such amounts as the trustee might deem proper. Provision was made that the trust for Paul would terminate on June 1, 1980, unless Paul was still alive on that date, but if Paul were still alive on that date the trust should continue as long as Paul lived. After Tisbey filed the will for probate, Paul retained counsel and contested the validity of decedent's will and codicil on the ground of mental incapacity and undue influence. Paul's contest was unsuccessful in the County Court, and on November 29, 1966, an order was entered by that court admitting the will to probate and appointing Tisbey as independent executor. *283 Paul appealed the decision of the County Court to the Rusk County District Court. On November 21, 1966, Paul filed a suit against Tisbey in the District Court of Harrison County. Paul's original sworn petition alleged in part as follows: COUNT II
1. Plaintiff alleges that on or about the 22nd day of March A.D. 1946, Plaintiff and his Mother GERTRUDE BATH entered into a valid, legal and binding Contract and Agreement with each other under the terms of which they agreed each with the other that in consideration for services rendered and to be rendered by PAUL A. BATH in managing the business of GERTRUDE BATH she would Will to Plaintiff an undivided one-third (1/3) interest in her estate which Agreement is more fully set out in the Will of Gertrude Bath reading as follows: THE STATE OF TEXAS COUNTY OF HARRISON KNOW ALL MEN BY THESE PRESENTS: That I, Gertrude Bath, a widow, and a resident of Harrison County, Texas, being in good health, of sound and disposing mind and memory and above the age of twenty-one years do make and publish this my last will and testment, hereby revoking all wills by me at any time heretofore made. I. I direct that all of my just debts be *284 paid out of my estate by my executor hereinafter named, as early after my death as the safe and prudent management of my estate will permit. II. For and in consideration of the love and affection that I have for all of my three childre, [sic] Blossom Lucille Gumbin, Tisbey A. Bath and Paul L. Bath and as further consideration for services rendered and to be rendered in the managing of my business by the said Paul L. Bath, it is my desire and I do hereby give and bequeath all of my estate, real, personal or mixed, that I may die seized and possessed of, after the payment of my just debts, together with all expenses incident to the probating of this will, to my three children above mentioned, one-third each, share and share alike, in fee simple, except my personal clothing and jewelry which I hereby give to my daughter the said Blossom Lucille Gumbin. III. For and in consideration of the love and affection, and services above described, I do hereby give and bequeath all of the rest and residue of my estate to my above named three children, one-third each, share and share alike. IV. I do hereby appoint Paul L. Bath as Independent Executor of this my last will and testament *285 and direct that no bond shall be required of him and no other action shall be had in the county court in relation to the settlement of said estate other than the probating and recording of this, my will, and the return of statutory inventory and appraisement and list of claims of said estate and all claims due or owing to me at the time of my death. In witness whereof, I have set my hand on this the 22nd day of March, A.D. 1946. s/Gertrude Bath That such Will was duly executed and witnessed in accordance with the Statutes of the State of Texas. Tisbey filed an original answer to Paul's original petition which consisted of a general denial of the factual allegations made by Paul. Subsequently, Paul filed several amended petitions and brought in Blossom's and Paul's children as parties to the suit because of Tisbey's insistence that these persons be made parties. In pleadings filed by Tisbey subsequent to his original answer to Paul's original petition, Tisbey did not specifically admit or deny that there was a 1946 will but referred to "a will allegedly executed by Gertrude Bath." In Paul's fourth amendment to the original petition filed September 22, 1967, the language of the *286 alleged 1946 will was not set forth verbatim but reference was made to a contract or agreement between Paul and his mother on or about March 22, 1946, under which "they agree each with the other that in consideration for services rendered and to be rendered by PAUL BATH in managing the business of GERTRUDE BATH she would will to Plaintiff an undivided one-third (1/3) interest in her estate." Tisbey saw what he believed to be a copy of the alleged will of decedent of March 22, 1946, and was of the opinion that such a will had been executed by decedent. Tisbey interviewed one of the witnesses to this alleged will who stated to Tisbey that he recalled having witnessed decedent's signature to the will of March 22, 1946. There were conferences between the attorneys for Tisbey and the attorneys representing Paul regarding disposition of Paul's suit in Harrison County. Tisbey's counsel recognized that Paul had a "dangerous" suit in Harrison County and that there was possible merit to Paul's case concerning the probate of the will in Rusk County which was then on appeal. Tisbey wrote a letter dated August 1, 1967, to Paul's attorney which stated in part as follows: These few suggestions, *287 as outlined in our conversation yesterday: * * * * * Your client should quit-claim, in behalf of the beneficiaries named, all personal property covered by the decedent's Codicil. Further agreement in writing that the intervivos trust is a valid binding trust, and that he represents that he will make no attack thereon. There will be some additional costs for you to pay in the contest due to depositions which were issued and had not been returned at the time the judgment was entered in the District Court. I understand that you will take care of these items. I will again stress the point that the case in Harrison County be disposed of on its merits. I, neither individually nor as Independent Executor, agree to entry of such a judgment. It is also my intention to advise Winston Taylor of the facts and the law in this case. In the event, however, that judgment is entered for Paul in that case, it shall not be executed upon until the estate has been fully administered. * * * This, together with the other matters I discussed with you, should fully advise you of the procedure to be followed. Under date of September 6, 1967, Tisbey wrote a 7-page letter to the attorney for Paul's *288 children with respect to the Harrison County suit which stated in part as follows: I have been previously advised that you represent Paul's children as Defendants in the above suit. As you well know, Mother's Will, which has been admitted to probate, provides that one-third of her estate go in trust for Paul with me as Trustee; and, in the event of Paul's death, that this trust be divided into three equal shares, one to Winston Bath, one to Trudy Bath, and one to Edwin Bath, or the lawful heirs of their body. The trust is to be terminated in 1980 unless Paul or Blossom are alive at that time. The trust only provides for the payment of income to Paul during his life with the remainder to the children. A similar inter vivos trust was created about eight years before Mother's death. * * * * * Shortly after Mother's Will was filed for probate, Paul filed a contest on the grounds of her mental incapacity and my undue influence. This contest was denied by final judgment on July 18, 1967. At that time I agreed that judgment may be entered in the above captioned cause adjudging Paul to have a binding and enforceable contract with Mother for one-third of her estate after administration, *289 the judgment not to be entered by the Court pursuant to the agreement, but based upon a meritorious cause of action proven by the evidence.
Additional agreement included the following: Each of Paul's children to be represented in the case by independent counsel who shall be advised fully of the facts. * * * * * Additionally, in my opinion, Paul does not have a meritorious cause of action. I am obliged to give you the facts in the case. I am sure that you know Paul is principally relying upon a Will written in 1946 which you witnessed. This Will provides for Paul to have one-third of the estate because of Mother's love and affection for him and because of services which he has performed in the past and will perform in the future for her. The Will, which he relies upon, is silent in the most important aspect. The element of revocability inheres [sic] in a Will and to read into it a memorandum of a contract not to revoke it, when no mention is made of such a contract, is not warranted by any principle of law. * * * * * The statute of frauds (Art. 3995) has been held to apply to all parol agreements to devise land and when land constitutes a part of the estate, *290 the entire agreements are unenforceable. * * * It is also the law in Texas that even full performance by one party does not take this parol agreement out of the statute of frauds. We have done quite a bit of research on this point and have concluded that parol testimony adding to the written memorandum Paul holds will not justify the entry of a judgment in his behalf. However, there are additional factors that indicate no such contract as he now claims actually existed. Paul claims to have made the agreement in 1946 (at the time of the writing of the 1946 Will), but no evidence other than his personal assertions indicate an enforceable agreement such as he now claims. * * * * * The court should not make a contract for the parties and then enforce it, the general rule being that the courts look to more than a preponderance of the evidence to establish such a contract by parol testimony. When the statute of frauds is pleaded, this in Texas, at least puts the matter to a determination from the point of law. * * * The contract may be very much affected by acts and conducts on the part of the promissor and the promisee. Frequently their conduct must be so inconsistent with *291 the agreement as to cast serious doubt upon it, especially under certain circumstances. The very fact that the promissor subsequently executed a Will making other disposition of the property than was agreed to be made negatives such a parol agreement. * * * In the rebuttal of the claim of such a contract reference will be had to the claims of the parties, their relations, dealing with each other, and conduct toward each other during the lifetime of the promissor, which acts and conduct if in any respect are inconsistent with the claim of an oral contract, such acts and conduct will be given due weight in the final determination of the question of whether such contract actually existed. * * * * * * * * The fact that the promisee under the alleged oral promise did not rely upon the contract in the first instance, but undertook to have the promissor's Will declared invalid because of her incapacity to make a Will weighs against the assertion of the existence of this contract. * * * In this case you know that Paul first contested the Will in July of 1966, and it was not until the time the Will was probated in the County Court in November that he asserted the claim in this case. *292 In this case Mother took part of her property out of her estate and put it into an inter vivos trust which the Plaintiff knew about for many years before the death of the decedent. He did not during any of this period mention the alleged contract. He protested the inter vivos trust on a daily basis. He saw attorney after attorney seeking relief from this. He even knew of the testamentary trust long before Mother's death, but never mentioned his so-called agreement to anyone until November, 1966. * * * We too have reason to believe that the alleged agreement is the creature of the imagination of his own lawyer, * * * Paul did serve Mother in some capacity for a period of approximately ten years after the alleged agreement, after which time he quit his employment stating that he was going to get other work and that he would come off the payroll of the promissor in a short period of time. This was when Mother offered to continue his employment but merely relieved him of his bookkeeping duties. * * * * * Reflecting upon this situation, it appears that the period of years over which the services by Paul were to be performed is not specified, either in the pleadings or the *293 alleged testament, so that it is vague and uncertain and for such reason unenforceable, but it also appears that it was contemplated that this service was to continue until the promissor's death; at least such would be the implication. The termination of these services was not due to any fault of the promissor, since Mother agreed to keep Paul employed and merely relieved him of some of his responsibilities without any reduction of pay. These facts are documented in letters written in Mother's own handwriting which I will make available to you upon request, and also in letters written by Paul which I will also make available to you upon request. What actually happened was that Paul, taking offense upon being relieved of some of his responsibilities, told Mother that he was quitting, would seek other employment, and thus the services were terminated due to his acts alone. Of course, Mother could not under the law enforce the contract for personal services, yet he seeks to now hold her estate to this alleged contract which I do not believe he can do. None of Paul's children was a minor on September 6, 1967. Prior to the trial of the case in Harrison County, Tisbey and his counsel *294 researched the position of Paul under the Federal income tax law and Tisbey's counsel told Paul's attorney that in their opinion Paul would become liable for income tax upon the amount received under a judgment for his services to decedent or a judgment entered in his favor in the Harrison County suit. Paul's suit against Tisbey and others in Harrison County was tried on September 22, 1967. The trial consisted entirely of Paul's testimony which was recorded in less than seven pages of transcript. Paul testified that he had performed services for decedent during her lifetime, that he had performed these services from about January 1933 until he went into the Army and after he returned from military service in 1945 began again to perform services for her. The following then transpired: Q. Nowin 1946 I will ask you whether or not there was any agreement reached between you and your mother whereby she would do anything because of the services you were rendering and had previously rendered to her? A. Yes, sir. Q. What kind of agreement was reached with you and your mother in reference to her giving you any properties, if there was such an agreement? MR. TURNER: To which we object, *295 your Honor, the agreement would be contrary to Article 3995, subdivision 4 of the statutes - THE COURT: I will overrule your objection. MR. TURNER: Note our exception. MR. TURNER: May the objection run to all of the testimony regarding the agreement, your Honor? THE COURT: Yes. MR. TURNER: Thank you! MR. SMITH: Q. In reference to what your mother would do for you in reference to her property because of the services rendered, without me leading you, what agreement was reached, sir? A. She agreed to leave a will willing me one-third of the property that she died seized and possessed of. Q. Was that one-third she was to leave you to be in fee simple, sir? A. One-third of all her property, personal property and real property, and all the property that she owned, in fee simple. Q. Now Mr. Bath, after that time, up until the time she died, not after she died but up until the time she died, did you ever receive any notice that she had a will different to that, sir? A. No, sir. Q. Did you know that she had done different from that up until the time she died, sir? A. No, sir. Q. Mr. Bath, I will ask you whether or not at the time your mother died she owned real *296 properties in Harrison County, Texas, sir? A. Yes, sir. * * * * * Q. Mr. Bath, after your mother died did you learn and do you now have personal knowledge that she had a will and testament that did not leave you a third of her properties in fee simple? A. Yes, sir. Q. Did you learn that under the terms of that will, which is filed in Rusk County, that instead of your third interest being in fee simple it was in trust? A. Yes, sir. Prior to the trial the Statute of Frauds had been raised as a defense against Paul's alleged contract and a brief had been filed and oral argument heard regarding that issue by the trial judge. Tisbey's attorneys did not object to Paul's testimony as being in violation of the Texas Dead Man's Statute since they believed that objection had been waived when they had asked Paul about transactions with decedent in connection with the Rusk County probate proceedings. Tisbey's attorneys did not cross-examine Paul. They put no witnesses on the stand to refute Paul's testimony because they knew of no witnesses to Paul's conversations with decedent. The only evidence offered by Tisbey's attorneys were the will which was probated in Rusk County, the *297 order of probate, and the inventory and appraisement from the probate proceedings in Rusk County. They did not offer any of the letters from Paul to decedent or any of the letters from decedent to Tisbey. Tisbey was aware that decedent's estate might be able to take a tax deduction on the amount paid to Paul if Paul was awarded the payment under his alleged contract with decedent. On September 22, 1967, the same day of the trial, the Harrison County District Court entered a judgment which provided in part: Whereupon all parties concerned announced in open Court that they were ready for trial and all matters of law and fact were submitted to the Court and the Court proceeded to consider the pleadings, evidence and argument of counsel offered herein, and after considering such, the Court finds that the Plaintiff, PAUL BATH, did render personal services to GERTRUDE BATH, which personal services were valuable to her and that the agreement of the Plaintiff by and with GERTRUDE BATH of March 22, 1946 was a valid, legal and binding contract and constitutes a valid claim against the estate and the properties composing 1/3 of the Estate of GERTRUDE BATH, deceased, save and except the items *298 of personal property devised to the various beneficiaries under the codicil to the last will of GERTRUDE BATH, deceased, and based upon such findings, the Court finds that the facts and law are with the Plaintiff, PAUL BATH, and that the following judgment should be entered: IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the Plaintiff, PAUL BATH, do have judgment for specific performance against TISBEY A. BATH, Independent Executor of the Estate of GERTRUDE BATH, deceased, to recover under his contract an undivided one-third (1/3) of the Estate of GERTRUDE BATH, deceased, after said estate has been administered in Cause No. 7112 now pending in the Probate Court of Rusk County, Texas, including the payment of all debts, taxes, costs, attorneys' fees and expenses of administration, save and except the items of personal property devised to the various beneficiaries under the codicil to the last will of GERTRUDE BATH, deceased, and the said TISBEY A. BATH, as Independent Executor of the Estate of GERTRUDE BATH, deceased, shall deliver to the Plaintiff, PAUL BATH, in fee simple an undivided one-third (1/3) of the Estate of GERTRUDE BATH, deceased, after all debts, taxes, costs, attorneys' *299 fees and expenses of administration have been fully paid, and at such time as administration is no longer necessary, save and except the items of personal property devised to the various beneficiaries under the codicil to the last will of GERTRUDE BATH, deceased, said interest hereby awarded to the Plaintiff, PAUL BATH, is the same interest which was devised by the last will of GERTRUDE BATH to TISBEY A. BATH, Trustee for the benefit of PAUL BATH, save and except the items of personal property devised to the various beneficiaries under the codicil to the last will of GERTRUDE BATH, deceased, and said last will of GERTRUDE BATH, deceased, insofar as the same conflicts with the contractual agreement by and between PAUL BATH and GERTRUDE BATH as described in Plaintiff's Fourth Amended Original Petition, is hereby declared void and of no further force or effect. However, the Court finds that the Plaintiff, PAUL BATH, has quit claimed any interest in the items of personal property devised to the various beneficiaries under the codicil to the last will of GERTRUDE BATH, deceased, to the beneficiaries named therein, and he shall therefore recover no interest in and to such items of personal *300 property disposed of by said codicil. Paul's attorney, under date of September 21, 1967, wrote Paul a letter which stated in part as follows: On November 17, 1966, you gave to the law offices of * * * a contract in writing, agreeing to pay jointly and not severally, to said firms the sum of $25,000.00 when and if they delivered to you an undivided One-third (1/3) of the properties which Gertrude Bath died seized and possessed. By this letter, we state that we agree to reduce said fee to the sum of $20,000.00 to be paid jointly and not severally, with said $20,000.00 to be paid when an undivided One-third (1/3) of the properties which Gertrude Bath died seized and possessed, less those properties set forth in the Codicil which was probated in the County Court of Rusk County, Texas, and less all administration costs and expenses of whatsoever nature that might have been charged against said estate, including, but not being limited to any applicable taxes, either state or federal, are delivered to you. This sum of $20,000.00 shall become due and payable immediately upon the United States Government issuing its final letter closing all tax controversies concerning the estate of *301 Gertrude Bath. The $20,000.00 provided for herein shall be paid to us by virtue of our effecting a settlement and having a judgment entered in Cause No. 23,416 [the Harrison County suit] now pending in the District Court of Harrison County, Texas, * * * and we shall not be expected to perform any other services in order to earn and be paid said sum of money. * * * Prior to September 22, 1967, when Paul testified in the Harrison County suit and the judgment in that suit was entered, his attorneys had informed him that they had finally arrived at an agreement whereby Paul was to take the witness stand and say that he had an agreement with his mother for services rendered and that a judgment in the District Court of Harrison County, Texas would be entered to give him a third of the estate. Paul knew he had no agreement with his mother to leave him one-third of her estate as payment for services he rendered to her but was willing to testify to such an agreement in the suit in Harrison County because he considered it necessary to keep his brother from stealing what he considered to be his and he considered his false testimony under oath in the Harrison County suit to be in accordance *302 with an agreement entered into to divide the estate. He was informed that he would be required to withdraw the contest on the will in Rusk County. Paul was extremely hostile toward Tisbey after decedent's death and would not speak to him. Paul filed other suits against Tisbey and filed a complaint against Tisbey with the State Bar Grievance Committee. Paul was of the opinion that Tisbey as trustee of the inter vivos trust was treating him arbitrarily and that Tisbey would treat him in the same manner as trustee of the testamentary trust. On the estate tax return filed for decedent's estate a deduction was claimed on Schedule K in the amount of $85,953.32 for an "amount due Paul Loyd Bath under contract for personal services." Following an audit of the estate tax return, the Dallas district director mailed Tisbey an estate tax closing letter showing a net estate tax of $40,362.93, which amount was determined after allowing a deduction of $85,953.32 for the claim of Paul. Tisbey as Independent Executor of the Estate of Gertrude Bath paid Paul, by or during 1970, the sum of $85,953.32 in satisfaction of the judgment of the Harrison County District Court entered September 22, 1967. *303 The assets of the estate have been fully distributed and Tisbey does not now hold any assets as independent executor. Respondent in his notice of deficiency to Tisbey as independent executor of decedent's estate, issued September 11, 1970, increased the taxable estate as reported by $85,953.32 with the explanation that that amount "claimed as a debt of the decedent to Paul Loyd Bath does not constitute an allowable deduction in computing the taxable estate." OPINION Section 2053[2] provides that for estate tax purposes the value of the taxable estate shall be determined by deducting from the value of the gross estate such amounts for claims against the estate as are allowable by the laws of the State under which the estate is being administered. This section provides a limitation to the effect that the deductions allowed for claims against the estate, when founded on a promise or agreement, shall be limited to the extent that they were contracted bona fide and for an adequate and full consideration in money or money's worth. *304 Petitioner in this case takes the position that Paul's suit against Tisbey in Harrison County was a claim against the estate, that it was a valid claim allowable under the laws of Texas, and that Paul's claim was for an indebtedness contracted bona fide and for an adequate and full consideration. Respondent does not take issue with petitioner on the fact that Paul's suit was a claim against decedent's estate but does contend that the claim was not properly allowable under the laws of Texas and that it was not for an indebtedness contracted bona fide for an adequate and full consideration. Petitioner relies strongly on Paul's claim being allowable under the laws of Texas on the judgment entered by the Harrison County District Court and the provisions of section 20.2053-1 (b) (2), Estate Tax Regs., [3] to the effect that the decision of a local court as to the amount allowable under local law of a claim will ordinarily be accepted if the court passes upon the facts upon which deductibility depends. Petitioner recognizes that this regulation also provides that it must appear that the court actually passed upon the merits of the claim but points to the fact that the regulation further *305 provides that passing upon the merits will be presumed in all cases of an active and genuine contest. Petitioner takes the position that because Tisbey insisted that the court enter its judgment on the testimony of Paul rather than under a settlement or a consent judgment, we should conclude that there was an active contest of the suit in Harrison County. In our view the facts do not support petitioner. We have set forth a number of the facts concerning the entry of the judgment in Harrison County in detail, and our conclusion of fact from these detailed facts is that Tisbey, through his attorneys, made an agreement with Paul, through his attorneys, to permit the entry of the judgment in Harrison County granting to Paul one-third of the net estate after payment *306 of administrative expenses. The record indicates that Tisbey wanted to settle the suit in order to have the appeal from the order admitting the will to probate dismissed and to avoid prolonged litigation. Tisbey's own interest in the assets of the estate was not decreased by the settlement. In our view Tisbey wanted the judgment entered after Paul's testimony because of his belief that if this method were used for settling the case, a deduction would be permitted for the amount paid to Paul by the estate in computing its estate tax, as well as his belief that an order so entered would protect him from any action Paul's children might at a later date bring against him. It was Tisbey who insisted that Paul's children be made parties to the suit before he would agree to the settlement. On the basis of all of the evidence here and considering the testimony of both Tisbey and Paul, as well as that of the attorneys who testified, we conclude that in substance the judgment entered by the Harrison County District Court was a consent decree. Here, we comment that even though Paul testified in this case that his testimony in the Harrison County case on September 22, 1967, was false, we find *307 Paul's testimony in this case in all respects believable. Without condoning the fact that Paul was willing to testify falsely as part of what he considered an overall settlement of the Harrison County case, we do in all respects believe his testimony that it was his belief that the testimony which he gave in Harrison County was part of an overall settlement that caused him to so testify. Also, without condoning Paul's filing of a suit on an alleged agreement which he testified in this case did not exist, we believe his testimony in this case. Paul's explanation was that after he found the "will" of March 22, 1946, he felt justified in bringing the suit since his mother had told him many times that she intended to treat all her children alike. Paul explained that even though he had no agreement with his mother that he would be treated equally with the other children as compensation for his services, he viewed the statement made to him by his mother as a promise which he blamed Tisbey for her failure to keep. Paul viewed this belief of his, coupled with his distrust of Tisbey, to justify his bringing of the suit based on an alleged agreement which he knew did not in fact exist. Petitioner *308 contends, however, that even if we conclude, as we do, that the judgment rendered in Harrison County was in substance a consent decree, we should hold that this decree was in recognition of a valid claim. Section 20.2053-1(b)(2), Estate Tax Regs., [4] provides that a consent decree should be accepted when the consent was a bona fide recognition of the validity of the claim and not a mere cloak for a gift and was accepted by the court as satisfactory evidence upon the merits. Petitioner argues that there is no evidence in this case that Tisbey was motivated to make a gift to Paul or that the judgment on the claim was a cloak for a gift to Paul. Petitioner concludes, therefore, that the consent decree was a bona fide recognition of the validity of Paul's claim. *309 While we agree with petitioner that there is no evidence of Tisbey's desire to make a gift to Paul, there is evidence that the amount provided for in the judgment was a substitute for the life interest which Paul would have received in one-third of the estate with the remainder to his children. Tisbey had no interest really adverse to Paul since his part of the estate would in no way be increased should Paul be unsuccessful in his suit, and, in fact, would be increased by the hoped-for tax consequences in the event Paul's suit was successful. Petitioner further contends that Paul's children had a true adverse interest to Paul. In spite of the lengthy letter that Tisbey wrote to the attorney for Paul's children, the record shows that they in no way contested Paul's suit in Harrison County. The record shows that the children were adults at the time of the trial in Harrison County. The indication is that the children, as distinguished from Tisbey, did have a motivation of a gift to their father. At least there is nothing in this record to indicate to the contrary, and the fact that they did not contest the case in Harrison County, even though their lawyer knew of the weakness of Paul's *310 case, indicates that they did have in effect the desire to make a gift to their father. Also, in the view of Paul's children, Paul might be considered better able to conserve one-third of their grandmother's estate to pass on to them than would Tisbey. It would be expected that Paul's animosity to Tisbey would have affected Paul's children's trust of Tisbey. It is well settled that this Court is not bound, in reaching its decision in this case, by the judgment of a lower State court such as the Harrison County District Court. Commissioner v. Estate of Bosch,387 U.S. 456 (1967). In fact, petitioner does not contend to the contrary but rather argues that because of the circumstances under which that judgment was entered, this Court should accept it as a proper determination of the Texas law as to Paul's rights. See Estate of Anna Lewis,49 T.C. 684, 688 (1968), and In Re Estate of Abely,489 F. 2d 1327 (C.A. 1, 1974), affirming 60 T.C. 120 (1973). We conclude in part from Paul's testimony in this case, which we believe; *311 and in part from the fact that Tisbey, with full knowledge of the many defenses he had to Paul's suit, chose to make only one and that merely by an objection to evidence which, when overruled, was not the subject of an appeal; and in part from the fact that Paul was not cross-examined when he testified in the Harrison County court case and that the letters of the decedent to Tisbey and of Paul to decedent which were put in evidence in this case were not placed in evidence in Harrison County, that the result reached by the Harrison County court would have been an unreasonable result had a full contest of the case been made and all pertinent facts presented to the court. Having concluded that there was no real contest of Paul's suit, that this Court is not bound by the judgment of the Harrison County Court, and that the result reached by that court would have been unreasonable had the facts been fully presented to that court, we must look to the evidence here to determine whether, in fact, Paul's claim against the estate was a valid claim under Texas law. Estate of Anna Lewis,supra. In our view the evidence here supports respondent's position that Paul's claim was not a valid *312 claim. To us the evidence shows that all Paul's mother, even considering the 1946 will, had ever stated to Paul with respect to her estate, and all Paul thought his mother had ever said to him, was that she planned to treat all of her children alike both in her lifetime and with respect to her will. This is far from any contract to leave Paul one-third of the estate because of his services. In fact, petitioner does not argue that such statement by Paul's mother would constitute a contract to pay Paul for services under Texas law but recognizes that it would not. Since there was no debt due to Paul by his mother's estate under Texas law, his receipt of one-third of the estate under the settlement was a substitute for the one-third of the estate which his mother's 1960 will left in trust for him with the remainder over to his children. Since what Paul received was a substitute for his inheritance, it is to be treated not as an indebtedness of the estate but rather as a portion of the estate which passed to Paul by inheritance. Lyeth v. Hoey,305 U.S. 188 (1938). Cf. First National Bank of Amarillo v. United States, 422 F. 2d 1385 (C.A. 10, *313 1970). In reaching this conclusion we have recognized that had the amount Paul received under the judgment in fact been payment to him for services, it would have had the character of an indebtedness of the estate to Paul and been deductible. Cotnam v. Commissioner,263 F. 2d 119 (C.A. 5, 1959), affirming in part and reversing in part 28 T.C. 947 (1957). Both parties recognize that the result we have reached here is compatible with that reached in Bath v. United States,480 F. 2d 289 (C.A. 5, 1973). That case involved Paul's suit arising from respondent's determination that Paul was liable for income tax on the $85,953.32 he received since under the Harrison County court judgment, it was received for services rendered to his mother. The case was tried to a jury and the appeal to the United States Court of Appeals for the Fifth Circuit was from the denial by the District Court Judge of the Government's motion for a directed verdict and for judgment notwithstanding the verdict. While we recognize, as petitioner argues, that we are not bound in any way by the judgment in the case of Bath v. United States,supra, *314 but must come to our own conclusion from the evidence as to the nature of the amount received by Paul, we are guided by the statements made by the Fifth Circuit with respect to the law applicable to substantially the same factual situation as is present here. In that case the Fifth Circuit stated the facts as follows (480 F. 2d at 290-291): Paul prevailed in his attack upon the will by what appears to be, in light of all the evidence, a settlement. More precisely, the executor, Tisbey, tacitly waived opposition. Paul testified in the probate court as to his alleged contract with his mother. He was not cross-examined, nor was the 1946 will, allegedly supportive of their contract, introduced into evidence. The attorney for Tisbey did not raise the "dead man statute" which prevents heirs from testifying about transactions with a deceased. Vernon's Ann. Tex. Civil Rev. Stat., Art. 3716. Moreover, that attorney testified that he had agreed not to appeal the state trial court's ruling. At the conclusion of a brief probate hearing, a judgment was immediately presented to the judge for his signature. It seems clear that Tisbey could have presented substantial defenses to *315 the claim by Paul. Indeed, in a lengthy letter to the attorney for the children, Tisbey catalogued the defenses he might have interposed. He chose not to do so. In the district court, Paul testified, and Tisbey agreed, that at the time of Gertrude Bath's death there were no uncompensated services outstanding; Paul had been paid a salary as he had performed the work for his mother. Paul stated that he attacked the trust feature of the will because he feared arbitrary treatment by Tisbey. Paul testified that Tisbey had warned him: "If you do just exactly like I tell you, and Blossom does, I will give you a little of it." Paul also testified that he had great difficulty in receiving any benefits from another trust that Gertrude Bath had created for his benefit during her life, with Tisbey as trustee. Paul was apprehensive about future altercations with Tisbey. Indeed, when Paul first began his attack upon the will, Tisbey moved to have Paul declared insane and requested that a guardian be appointed for him. Though Tisbey testified that the judgment was not the result of a settlement, Paul stated that it was, and that the simulation of adversary litigation was necessary because of *316 Tisbey's duty as executor to defend the provisions of the will naming Paul's children as remaindermen. The facts as summarized by the Fifth Circuit in Bath v. United States,supra, are much the same as the facts here. Here, as in that case, Tisbey in effect testified that the judgment was not the result of a settlement and Paul stated that it was. While we do not brand Tisbey's testimony as false since he carefully worded his answers to point to his agreement being with the insistence that Paul testify and the judgment be entered on the "merits" of the evidence, we do believe Paul's testimony that the agreement was that no contest would be made of his testimony and in effect the judgment would be permitted to be entered. This is borne out by the many facts we have found in this case, some of which are identical to the facts recited by the Fifth Circuit in Bath v. United States,supra. Following the recitation of the facts as we have set forth above, the Fifth Circuit analyzed the differences between the Bath case and the case of Cotnam v. Commissioner,263 F. 2d 119 (C.A. 5, 1959), affirming in part and *317 reversing in part 28 T.C. 947 (1957), as follows (480 F. 2d at 292): As stated in Cotnam, "the amount received is taxable or nontaxable according to what it represents." We reassert this principle. The tax treatment of proceeds from a will contest must reflect the character of the claim upon which a judgment or settlement is based. Here Paul's claim was insubstantial by his own admission, and there is a strong likelihood that it might have failed had a genuine opposition been presented. Certainly the tax effect of a judgment or settlement based upon a bona fide claim will be determined by the character of the claim made. But, in the light of the absence of true adversary litigation, the total waiver of substantial defenses, and an admission by the parties that the compensation claimed had already been paid, it is not possible to determine conclusively the nature of this payment solely by the character of the claim. Nor does a label applied in a state court judgment conclusively determine what a payment "represents." Characterization as bequest or compensation is to be determined by federal law, not local characterization. Lyeth,305 U.S. 193, 59 S. Ct. 155, 83 L. Ed. 119. *318 Even where federal tax liability turns upon local characterization, federal authorities are not bound by determinations by a state trial court. Commissioner of Internal Revenue v. Bosch, 1967, 387 U.S. 456, 87 S. Ct. 1776, 18 L. Ed. 2d 886. Especially suspect are characterizations, such as we have here, not the result of bona fide adversary proceedings. SeeBosch,387 U.S. at 462, 87 S.Ct. 1776. [footnote omitted.] In the instant case Tisbey did give his opinion as to what the value of the services rendered by Paul might have been had they been rendered by another person of equal qualifications. His opinion was that during the early years when Paul was receiving $100 or $125 a month, a person of equal qualification, unrelated to decedent who may have taken the job, would have been entitled to $400 a month, and in the period after the War when Paul was receiving $250 to $400 a month, another person of equal qualification would have received $15,000 to $20,000 a year. Although Tisbey has handled a number of estates, there is nothing in the record to show that he had any expertise as to the salary of a person who handled the affairs of another *319 in the manner in which Paul handled decedent's affairs. Furthermore, no other person was ever found to take Paul's position. It is certainly common knowledge that the amounts paid to various persons for work varies with the employer's view of the competence of the individual and how satisfactorily the person employed discharges the requirements of the position. Paul testified in this case that he was adequately compensated by the salary payments and other benefits he received for the work he did for his mother during the years he was working for her. Even though Tisbey testified as to what might have been the expected compensation in his opinion for some other person performing the services performed by Paul, Tisbey did not specifically testify that Paul was not adequately compensated for the work he did for his mother in the years he did the work for her. We have considered Tisbey's testimony but in our view, even after considering his testimony, the record shows that Paul was adequately compensated during the years he worked for his mother for the work he did. The record is replete with evidence of the animosity which existed between Tisbey and Paul. The clear indication from the *320 record is that Paul believed he would not be treated fairly by Tisbey if his portion of the estate stayed in trust and that he had a right to have his one-third inheritance freed from the trust. Paul testified that he considered one-third of his mother's estate in fee simple to be his rightful inheritance and the indication is that in order to reduce conflict with respect to the probating of the will and his handling of an inter vivos trust, Tisbey was willing to let Paul have his one-third inheritance free of the trust. We therefore conclude that respondent correctly disallowed the deduction of $85,953.32 claimed by the estate. Because both parties have asked us to have the decision entered under Rule 155, Decision will be entered under Rule 155.
Footnotes
1. All references are to the Internal Revenue Code of 1954.↩
2. SEC. 2053. EXPENSES, INDEBTEDNESS, AND TAXES (a) General Rule--For purposes of the tax imposed by section 2001, the value of the taxable estate shall be determined by deducting from the value of the gross estate such amounts-- * * * (3) for claims against the estate, and * * * as are allowable by the laws of the jurisdiction, whether within or without the United States, under which the estate is being administered. * * * * * (c) Limitations.-- (1) Limitations applicable to subsections (a) and (b).-- (A) Consideration for claims.--The deduction allowed by this section in the case of claims against the estate, * * * or any indebtedness shall, when founded on a promise or agreement, be limited to the extent that they were contracted bona fide and for an adequate and full consideration in money or money's worth; * * *↩
3. Sec. 20.2053-1(b) (2)Effect of court decree.↩ The decision of a local court as to the amount and allowability under local law of a claim or administration expense will ordinarily be accepted if the court passes upon the facts upon which deductibility depends. * * * It must appear that the court actually passed upon the merits of the claim. This will be presumed in all cases of an active and genuine contest. * * *
4. Sec. 20.2053-1(b)(2)↩ * * * If the decree was rendered by consent, it will be accepted, provided the consent was a bona fide recognition of the validity of the claim (and not a mere cloak for a gift) and was accepted by the court as satisfactory evidence upon the merits. * * *